UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JULIEE L. BATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 1:12-cv-00308-RLY-DML |
| ROCHE DIAGNOSTICS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Juliee L. Bates, is a former employee of Roche Diagnostics Corporation ("Roche"). Following Roche's decision to terminate her employment in February 2011, Plaintiff filed the present case against Roche, alleging that Roche discriminated against her on the basis of her gender, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. ' ' 2000e *et seq*. ("Title VII"), and her alleged disability, under the Americans with Disabilities Act of 1990, 42 U.S.C. ' 12101, *et seq*. ("ADA"), as amended by ADA Amendments Act of 2008. Plaintiff also claims Roche retaliated against her in violation of Title VII, the ADA, and the Family Medical Leave Act, 29 U.S.C. § 2601 *et. seq*. Roche now moves for summary judgment. For the reasons set forth below, the motion is **GRANTED**.

## I.    Background

### A.    Roche Diagnostics

Roche is a worldwide diagnostics company that offers analytical and data management systems for the prevention, diagnosis, evaluation and monitoring of diseases.  (Declaration of Scott Kincaid ("Kincaid Dec.") ¶ 4).  Roche implemented and maintains leave and nondiscrimination policies designed to optimize its diversity initiatives in the workplace and prohibit discrimination or retaliation on the basis of age, national origin, and other protected characteristics.  (*Id*. ¶ 5).  Employees, including Plaintiff, have ready access to these policies including its EEO and FMLA policies, via Roche's intranet.  (Deposition of Juliee Bates ("Plaintiff Dep.") at 142-43).

### B.    Plaintiff's Employment

Plaintiff was hired by Roche on September 30, 2003, as an Information Security Consultant.  (*Id*. at 143 and Ex. 10).  Plaintiff's duties consisted of helping Roche personnel in Indianapolis understand the sensitivity of electronic computer data and computer password settings, and to ensure that there were no data security breaches.  (*Id*. at 147-48, 157).

Plaintiff's supervisor at the time, Mark Gabel, performed annual reviews of Plaintiff's performance.  (*Id.*, Exs. 15-17).  For example, on Plaintiff's 2005 Performance Appraisal, Gabel noted that Plaintiff "did an excellent job of taking ownership of [the Information Security Handbook] and driving the results to completion."  (*Id*., Ex. 17 at DEF1-115).  He also noted, however, that Plaintiff needed to focus on her "initiative,"

"taking on more of a leadership role with the Information Security Group," and becoming more "results oriented." (*Id*.).

Following Gabel's departure from Roche in 2006, Gregory Puckett became Plaintiff's supervisor. (*Id*. at 161). Puckett subsequently hired two women as Information Security Consultants to work with Plaintiff: Jodi Hood and Barbara Lanman. (*Id*. at 163-64). After becoming Plaintiff's supervisor, Puckett received complaints from Roche's diabetes care and professional diagnostics business units about several deficient risk assessments Plaintiff had conducted. (Declaration of Gregory Puckett ¶ 5). Accordingly, in her 2006 Performance Appraisal, Puckett gave her an overall rating of "Needs Development." (Plaintiff Dep. Ex. 18 at DEF1-117).

In the spring of 2007, Puckett told Lanman (who then told Plaintiff) that Plaintiff "must have slept with her previous manager to get her job." (*Id*. at 165). Plaintiff reported the matter to Human Resources Manager Scott Kincaid, who advised her to discuss the comment with Puckett. (*Id*. at 168). Plaintiff did so, and Puckett denied making the comment. (*Id*. at 169). Puckett's supervisor, Kurt Seiler, learned of Plaintiff's allegation, and ordered Puckett to apologize to Plaintiff because, in Seiler's opinion, Plaintiff is "the type of person Roche wants in their employ." (*Id*. at 176). Puckett's apology was an acceptable resolution to the issue for Plaintiff. (*Id*. at 178).

In the next appraisal of Plaintiff's performance, Puckett gave Plaintiff an overall rating of "Fully Achieved." (*Id*., Ex. 19). The score was higher than the rating Puckett had given Plaintiff the year before and was comparable to the ratings she received from Gabel. (*Id*., Exs. 15, 17).

3

### C.     Roche's Global Reorganization

Beginning in 2007, Roche began a company-wide reorganization of its Information Technology Security Department.  (Deposition of Joachim Bohnert ("Bohnert Dep.") at 13-14, 16).  During this process, the Indianapolis Information Technology Security Department in which Plaintiff worked was integrated into a newly formed Global Information Security Team that was focused on the company's worldwide operations.  (*Id.* at 192-93, 205).  The Global Information Security Team was responsible for engaging in risk-based security analyses in order to safeguard Roche's digital assets and proprietary information.  (Declaration of Joachim Bohnert ("Bohnert Dec.") ¶ 5).  As part of this reorganization, Plaintiff came under the supervision of Joachim Bohnert, who was based in Basil, Switzerland.  (Plaintiff Dep. at 192-93; Bohnert Dec. ¶¶ 2, 4).  Bohnert oversaw a team that included several employees in Europe as well as three female Information Security Consultants located in the United States: Plaintiff, Lanman, and Hood.  (Bohnert Dec. ¶ 6).

Bohnert selected Plaintiff to become the lead in risk management and administrative security for the new group.  (Plaintiff Dep. at 207).  In her new role, Plaintiff was responsible for, among other things, supporting global security functional areas in the development and maintenance of information security policies, procedures and standards.  (*Id.*, Ex. 22).  Plaintiff was also required to train users and managers in the area of Security Awareness, and to plan and direct information security projects that were focused on process improvements, operational efficiencies, and customer satisfaction.  (*Id.*).  The job requirements for Plaintiff's position included "[e]xcellent

communication and presentation skills," in addition to the ability to travel due to the global nature of the reorganized department.  (*Id.*).  Plaintiff was expected not only to have a mastery of information technology security and architecture, but also to communicate the complicated world of IT security to non-technically oriented business people within Roche through consulting projects and security training.  (Bohnert Dec. ¶ 7).  In this regard, Plaintiff was expected to be able to work independently to move projects to conclusion.  (*Id.*).

As part of the launch of the new global organization, Plaintiff attended a Diagnostics IT Security Network ("DISN") meeting in Hinterzarten, Germany on October 15-17, 2007.  (Plaintiff Dep. at 194 and Ex. 32).  Plaintiff also underwent training in Basel, Switzerland in December 2007, during which she first met Bohnert in person.  (*Id.* at 213-15).

### D.    Plaintiff's Performance Following the Reorganization

Over the next year, Bohnert had several opportunities to personally observe Plaintiff's performance.  (Bohnert Dec. ¶ 8).  One such occasion was at the February 27-28, 2008 DISN meeting in Frankfort, Germany, where Plaintiff spoke on Administrative Security.  (Bohnert Dec. ¶ 8 and Ex. 1).   In addition, Bohnert had regular contact with Plaintiff via telephone conferences, video-conferences, and by email, and traveled to Indianapolis to personally meet with Plaintiff and other Roche employees twice a year.  (Bohnert Dec. ¶ 8; Bohnert Dep. at 67).  From these interactions with Plaintiff, Bohnert noted that: (1) Plaintiff tended to jump from one subject to another without making a point; (2) Plaintiff did not adequately respond to *ad hoc* questions during presentations;

5

and (3) Plaintiff needed to improve her communication skills.  (Plaintiff Dep. Ex. 24;

Bohnert Dep. at 23).

### E.    Plaintiff's FMLA Leave

In June 2008, Plaintiff had a hysterectomy, which caused her to have nerve pain in

her right leg.  (Plaintiff Dep. at 46).  According to Plaintiff, her physicians were never

able to diagnose her condition.  (*Id*. at 44).   Plaintiff applied for FMLA with Liberty

Mutual, Roche's FMLA administrator, and Roche granted the same for the period May

28, 2008, through June 24, 2008.  (*Id*., Ex. 73).

### F.    Plaintiff's August 2008 Presentation

In August 2008, Bohnert observed Plaintiff give a security training session.

(Bohnert Dec. Ex. E-4).  Following that session, Bohnert emailed Joseph Kniesly

("Kniesly"), a Roche administrator located in Indianapolis who assisted him with

supervising Plaintiff, Hood, and Lanman, that stated, in pertinent part:

> We seem to have an issue with [Plaintiff] delivering . . . security trainings
> effectively.  Greg mentioned that she is damaging the reputation of security
> if she continuous [sic] doing that in [North America]. . . .  I have this on my
> to be solved in the near future list."

(*Id*.).

### G.    Plaintiff's 2008 Performance Appraisal

Based on his observations of Plaintiff's performance and feedback from others,

Bohnert concluded that Plaintiff did not take the initiative to solve problems, was not

decisive, failed to meet deadlines, and did not perform at a level expected of someone

with her experience.  (Bohnert Dec. ¶ 10).  Accordingly, Bohnert rated Plaintiff's

6

performance overall in her first full year in the Global Information Security Group as
"Partially Achieved." (Plaintiff Dep., Ex. 29). Bohnert explained that the quality of
Plaintiff's Security Awareness "was unacceptable and incompletely rolled out." (*Id*. at
DEF1-123). Plaintiff agreed with Bohnert's assessment: "[t]his is true.  Security
Awareness was not good." (*Id*.). Bohnert also commented that Plaintiff needed to act
independently: she "must make decisions on her own and take appropriate action instead
of deferring to Management." (*Id*. at DEF1-120). Bohnert explained: "[Plaintiff] will
execute a task once all steps have been identified.  However, this position requires the
employee to contribute independently for rout[ine] activities and escalate for exceptional
issues.  She must be able to effectively consult on Security topics . . . She has not
demonstrated the ability to do this independently." (*Id*. at DEF1-121). Plaintiff
responded: "I will be conscious of this in the future . . . I will be more independent and
influential." (*Id*. at DEF1-123). Bohnert thanked Plaintiff for her feedback and outlined
several steps for her to move out of the "Partially Achieved" rating:

(1).    Actively manage her communications on assigned tasks with her team
        leader [Bohnert] and colleagues;
(2).    Set herself priorities to accomplish by day, week and month;
(3).    Demonstrate that she can master her day to day work and assigned projects;
        and
(4).    Notify her functional leader [Kniesly] when she needs clarification or has
        questions.

(*Id*. Ex. 31). Plaintiff agreed that these requests were acceptable. (*Id*.).

## H.    March 2009 DISN Conference

Plaintiff informed Bohnert and Kniesly that she would not be able to attend the

March 2009 DISN Conference in Heidleberg, Germany due to health issues. (*Id*. at 64,

240-41; Affidavit of Juliee Bates ("Plaintiff Aff.") ¶ 40).   Plaintiff therefore attended the conference through a video conference service called Livemeeting.  (*Id*. at 242-43).   In addition to Plaintiff, Kniesly and the head of the Security Operations Center in Indianapolis, William Tucek, also attended the March 2009 DISN conference via Livemeeting.

Bohnert talked to Plaintiff in advance about the conference and advised her that she should attend whatever portions she wanted, but that he did not expect her to attend the entire two-day session through Livemeeting because of the six-hour time difference between Germany and the United States.  (Bohnert Dep. at 36-37).  Instead, Bohnert only expected Plaintiff to attend the portions for which she would be required to conduct a presentation.  (*Id*. at 39).  As as result, Bohnert scheduled Plaintiff's presentations for late in the day in Germany so that she would be able to conduct them during normal work-hours in the United States.  (Bohnert Dec. ¶ 12).  Plaintiff testified she had a difficult time connecting through the telephone lines, and was not able to get through for hours. (Plaintiff Dep. at 243).  Plaintiff also testified that the quality of the connection negatively affected her presentations.  (Plaintiff Aff. ¶ 46).

## I.     Plaintiff's Other Requests for FMLA Leave

In May 2009, Plaintiff applied and was accepted for admittance into the Mayo Clinic for, *inter alia*, right leg pain.  (Plaintiff Dep. at 69).  Roche granted her request for continuous FMLA leave from May 9, 2009, to May 19, 2009, to cover her hospital stay. (*Id*. at 69 and Ex. 76).  Roche also granted Plaintiff intermittent FMLA leave from May 20, 2009, to November 15, 2009, to cover her future appointments for physical therapy,

and continuous leave from September 18, 2009, to October 18, 2009, to cover a surgical procedure on her ovary.  (*Id*. at 64, 75).

### J.        Plaintiff's June 2009 Training Session

In May 2009, Bohnert and Kniesly asked Plaintiff to focus on conducting training sessions for Roche sites in North America and sketched out what they expected and her deliverables.  (*Id*., Ex. 40).  In connection with the training, Bohnert counseled Plaintiff not to become distracted by operational tasks and suggested that she prioritize her work in order to dedicate the necessary time to accomplish the training project.  (*Id*., Ex. 41). On June 16, 2009, while Plaintiff was on intermittent FMLA leave, Plaintiff conducted a security awareness training program for Ventana, a medical device manufacturer that Roche had acquired, in Tucson, Arizona.  (*Id*. at 83).  The session did not go well.  (*Id*. at 83 and Exs. 42, 45).  After the training session ended, Plaintiff warned Bohnert and Kniesly: "I think something might have gone wrong, but I'm not sure exactly."  (*Id*. at 267).  Jeff Oldakowski, the Manager of Information Technology for Ventana, provided a more comprehensive report on Plaintiff's performance to Kniesly:

> Julie [Plaintiff] – Appeared not to be as knowledgeable on the material.  IT staff had to correct her on some of the material.  There was an incident with [Plaintiff] and our Senior VP of HR.  Basically, the HR security training started with no introduction on the purpose or who [Plaintiff] was.  The Sr. VP jumped in and began to ask questions on the purpose of the training. Eventually, the Sr. VP left the training to take a call and returned later. [Plaintiff] felt the senior VP was rude and unprofessional while the Dr. VP felt [Plaintiff] started off on the wrong foot without any introductions. After the training, the Sr. VP, [Plaintiff], Jen-Loup (CIO) and I sat down to address the feedback.  This meeting did not go exceptionally well with both sides confrontational.

(*Id*. at 254 and Ex. 42).

9

Based on the information provided by Oldakowski, Kniesly advised Human Resources Manager Kincaid that despite reducing Plaintiff's tasks to allow her to focus on training, she still was not able "to prepare and present a professional training program." (*Id.*, Ex. 42). As such, Kniesly informed Kincaid that he and Bohnert were ready to take "the next performance escalation steps" with Plaintiff. (*Id.*). Thereafter, Bohnert and Kniesly met with Plaintiff and discussed her performance. (*Id.* at 267 and Ex. 45). Bohnert commented that the feedback Roche had received about her from the Ventana training "was not favorable" and that her "[b]ehavior during the training with HR was not acceptable; Ventana's head of IT has said you're not invited back." (*Id.*, Ex. 45). Additionally, Bohnert observed that Plaintiff's "training content was not appropriate for all groups; for IT was too basic." (*Id.*). Beyond training, Bohnert also noted that Plaintiff had "a lot of activities without a lot of accomplishments, such as exception forms that she had kept open for excessive periods of time. (*Id.*). Bohnert closed by imploring her to improve:

> Joe [Kniesly] and I want you to be successful. I am repeating this again: 'You can call me for guidance and support as mentioned.' Also our regular jour-fix [one-on-one] meetings are a[n] opportunity to talk on further steps. I know Joe will support you with the [North America] region issues. However, Joe and I cannot do the assigned tasks for you. You need to deliver and be able to resolve smaller issues on your own.

(*Id.*). Bohnert advised Plaintiff that he would be in Indianapolis the week of August 10 to talk in person, and that her performance "must improve significantly" by the end of August 2009. (*Id.*).

Plaintiff's overall performance, however, did not improve as requested by August 2009, and Bohnert subsequently met with Plaintiff to discuss additional deficiencies that he had observed. (*Id.*, Ex. 50). For example, Plaintiff had been assigned to work on a project to take the current exception management standard operating procedure ("SOP") and break it out into a separate work instruction and high-level SOP. (*Id.*). Bohnert noted that Plaintiff failed to perform the task on her own, forcing Bohnert to assume a larger role on the project than necessary to drive it to completion, and that Bohnert also had to frequently call her to keep on the delivery timelines. (*Id.*). Bohnert concluded that Plaintiff's performance in consulting – which represented a substantial portion of her job responsibilities – was not meeting the expectations of her position and reiterated that it "must improve." (*Id.*).

## K.    Plaintiff's 2009 Performance Appraisal

Bohnert delivered Plaintiff's 2009 Performance Appraisal to her on February 4, 2010. (*Id.*, Ex. 51). Bohnert gave Plaintiff the same overall score he had given her the year before – "Partially Achieved." (*Id.*). Bohnert explained that Plaintiff "still performs at a sub-standard level for someone at her experience level. She does not perform independently. She hasn't demonstrated the ability to work efficiently on complex tasks without extraordinary support from her manager or completion of tasks by her colleagues. Her working style is perceived as unstructured as she jumps into many topics at the same time. A clear demonstration on how she is going to resolve complex tasks is still missing." (*Id.* at DEF1-307). While Bohnert observed that Plaintiff could complete tasks if she specifically was told what to do, her position required her to "contribute

11

independently for routine activities and escalate for exceptional issues.  She must be able

to effectively consult on Security topics, e.g., delivery of a Security master plan.  This is

a[] significant factor in the requirements for this position.  Her performance in this area

does not meet expectations." (*Id*.).

Due to her rating and need to improve her performance, Bohnert advised Plaintiff

that the company would not incur the expense of sending her to Basel, Switzerland for

the April 2010, DISN conference. (*Id*., Ex. 52).  Plaintiff instead attended the April 2010,

DISN conference via Livemeeting. (*Id*. at 292-93 and Ex. 54).

### L.      Plaintiff Receives a Documented Counseling

In light of Plaintiff's ongoing performance problems, Bohnert placed Plaintiff on

Documented Counseling in May 2010. (*Id*., Ex. 55).  In the Documented Counseling,

Bohnert stated that Plaintiff's performance was unacceptable and that she had failed to

perform at a level commensurate with her experience.  For example:

> You should be able to analyze issues and formulate proposals
> independently; for example, when analyzing a topic, you must be able to
> identify the criteria used for your analysis, the pros and cons of the topic,
> develop a[n] recommended approach with sufficient justification for that
> approach and why that approach was selected over other alternatives. Your
> demonstrated performance to work independently is substandard, when
> compared to your peers.

(Bohnert Dec., Ex. 14 at DEF1-26).

Bohnert counseled Plaintiff to improve her working style by not jumping into

several topics at the same time, and that she examine how she manages a project instead

of preparing lists of activities and meetings "with inconsequential details." (*Id*. at DEF1-

26).  Bohnert also advised her to improve the communication she provided during her

security awareness training sessions and tailor the training appropriately to her audience –

which Bohnert regarded as a "critical success factor for the Global Information Security

organization." (*Id*.).

Plaintiff signed the Documented Counseling on May 27, 2010. (*Id*.). She

understood that Bohnert was "not happy" with the way she communicated and promised

to make "immediate changes" to comply with the terms of the Documented Counseling.

(Plaintiff Dep., Ex. 56).

### M.   Plaintiff Fails to Improve

Bohnert continued to work with Plaintiff, but in his opinion, she was not

improving in the areas outlined above. (Bohnert Dec., Exs. 15, 16, 17). Despite her

ongoing performance issues, Bohnert invited Plaintiff to attend the September 21-22,

2010 DISN meeting in Basel, Switzerland in person so that Bohnert and his superior,

Wolfgang Reh, could further evaluate her performance. (Plaintiff Dep. at 301; Bohnert

Dec. ¶ 30). Plaintiff conducted two presentations at the conference, including one on

Governance, Risk and Compliance. (Plaintiff Dep., Ex. 61). Bohnert and Reh attended

Plaintiff's presentation and regarded it as inadequate. (Bohnert Dec. ¶ 30). The slides

she prepared for the presentation were disorganized, difficult to read and confusing.

(*Id*.). Plaintiff also did not clearly and effectively communicate the objectives and

benefits of her topic to the audience and failed to explain the importance of the issue to

the audience. (*Id*.).

### N.   Plaintiff Is Placed On A Performance Improvement Plan

13

Bohnert concluded that Plaintiff had not satisfied the objectives identified in the

Documented Counseling and that she should be progressed to the next disciplinary step, a

Performance Improvement Plan ("PIP").  (*Id*. ¶ 31).  Accordingly, Bohnert drafted a PIP

for Plaintiff and sent it to Kincaid for review.  (*Id*.).  Plaintiff was subsequently served a

copy of the PIP on November 5, 2010.  (Plaintiff Dep., Ex. 64).

In the PIP, Bohnert observed that Plaintiff's "overall performance is still not

meeting the expectation of a security consulting position."  (*Id*. at DEF1-21).  Bohnert

therefore required that Plaintiff perform at a level commensurate with her experience;

improve her working style by not jumping into too many topics at the same time; create

proposed outlines and solutions; effectively consult on projects; and structure security

training appropriately for her audience – which he reiterated was a "critical success

factor" for the Global Information Security organization.  (*Id*. at DEF1-21).  The PIP

warned Plaintiff that if she failed to meet and consistently maintain the specific

objectives of the PIP over the next 60 days, this could lead to her termination.  (*Id*.).

### O.     Plaintiff's Performance Fails to Improve

On November 16, 2010, Bohnert attended a Quarterly Exception Review meeting

conducted by Plaintiff.  (Bohnert Dec., Ex. 20).  Bohnert was not satisfied with her

performance, noting that she failed to outline the objective of the meeting, and did not

instruct the audience on how she would run the session or what results would be

achieved.  (*Id*.).

On December 8, 2010, Bohnert provided Plaintiff with feedback on a cost

comparison that he asked her to put together.  (*Id*., Ex. 23).  Plaintiff gave him five (5)

slides of information, but failed to consider the cost of the various options and could not explain her methods in creating the comparison. (*Id*.). Bohnert subsequently rated Plaintiff as "Did Not Achieve" in her 2010 annual Performance Appraisal. (Plaintiff Dep., Ex. 70).

### P.   Request for Transfer

In January 2011, Plaintiff requested a transfer to an operations job at Roche. (Plaintiff Aff. ¶ 91; Plaintiff Dep. at 319). By policy, Roche does not transfer employees who are under a performance improvement plan. (Plaintiff Dep. at 320). Accordingly, Plaintiff's request was denied. (*Id*.).

### Q.   Plaintiff Is Terminated

Bohnert concluded that Plaintiff had not successfully achieved the terms of the PIP and that she should be terminated. (Bohnert Dec. ¶ 40). Bohnert sent Human Resources Manager Kincaid a summary of Plaintiff's 2009 and 2010 Performance Appraisals and Plaintiff's responses to his comments. (*Id*., Exs. 26-27). Roche approved Bohnert's decision to terminate Plaintiff. (*Id*. ¶ 40).

Bohnert flew from Switzerland to the United States to personally deliver the termination message to Plaintiff. (*Id*. ¶ 41). Bohnert met with Plaintiff along with Kincaid on February 7, 2011, and informed her that she had been terminated. (*Id*.). Plaintiff did not receive any severance. (Plaintiff Aff. ¶ 93). Human Resources Manager Kincaid testified that, under Roche's severance policy, employees who are involuntarily terminated are not eligible for severance. (Kincaid Dec. ¶ 12).

### R.   Charge of Discrimination

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 19, 2011, alleging discrimination based on sex, disability, and retaliation.  (Kincaid Dec., Ex. 5).   The EEOC issued its notice of right to sue on December 13, 2011, and Plaintiff filed the present action on March 9, 2012. (Compl. ¶ 34).

## II.    Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the burden rests with the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  *Id*. at 322-23.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."  *Waldridge v.*

16

*American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87); *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249-52.

## III.    Discussion

Roche argues that Plaintiff's Title VII sex and retaliation claims are barred by the statute of limitations, and that there is an absence of evidence to support Plaintiff's ADA and FMLA claims.  The court will begin with Roche's statute of limitations argument.

### A.    Title VII Discrimination and Retaliation Claims

The statute of limitations in Title VII actions requires the filing of a charge of discrimination with the EEOC within 300 days of an alleged discriminatory or retaliatory act.  42 U.S.C. § 2000-5(e).  Failure to file such a charge bars the claim.  *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 836-37 (7th Cir. 2008).

In this case, Plaintiff filed her charge of discrimination with the EEOC on March 19, 2011.  Thus, any claims based on discrete acts of discrimination or retaliation that occurred more than 300 days before that date – May 23, 2010 – are time-barred as a matter of law. *Id.*; *see also Mull v. Abbott Labs.*, 563 F.Supp.2d 925, 929 (N.D. Ill. 2008) ("If a plaintiff does not file a charge concerning a discrete act of discriminatory conduct within 300 days of its occurrence, her claim is time-barred and she may not recover.").

Plaintiff's Title VII sex discrimination claim is based on Puckett's statement that Plaintiff "must have slept with her previous manager to get her job" and her allegation that Puckett "treated [Plaintiff] worse than male employees."  (*See* Compl. ¶¶ 9-10). Plaintiff's Title VII retaliation claim is based on the allegation that she complained to the

17

Human Resources office regarding Puckett's statement.  (*Id*. ¶ 11).  The events about which Plaintiff complains occurred in 2007.  Moreover, Puckett left Roche in 2007 and thus, was no longer her supervisor, in 2007.  Accordingly, the conduct at issue in Plaintiff's Title VII sex and retaliation claims are time-barred as a matter of law.

### B.    ADA claims

Title I of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (2009).  Title I also provides that an employer discriminates against a qualified individual with a disability by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ."  42 U.S.C. § 12112(b)(5)(A).  The ADA also has a retaliation provision that prohibits employers from "discriminat[ing] against any individual because [he] has opposed any act or practice made unlawful by [the ADA] or . . . has made a charge [under the ADA]."  42 U.S.C. § 12203(a).   Thus, under the ADA, a plaintiff may bring three types of ADA claims: disparate treatment, failure to accommodate, and retaliation. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115-17 (7th Cir. 2001); *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001).  Plaintiff brings all three claims.  The court will begin its discussion with Plaintiff's disparate treatment claim.

### 1.    Disparate Treatment

Plaintiff seeks to prove her disparate treatment claim under the indirect method of proof.  This requires her to first establish a prima facie case of discrimination by showing that: (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson v. Bd. of Trs. of Comm. College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citations omitted).  If Plaintiff succeeds in making out his prima facie case, the burden shifts to Roche to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff.  *Id.*  If Roche does so, the burden then shifts to Plaintiff to establish that Roche's reasons are a pretext for discrimination.  *Id.*  The court will begin with the threshold issue: whether Plaintiff was disabled within the meaning of the ADA.

A "qualified individual with a disability" is defined by the ADA to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The question of whether one is a qualified individual with a disability is determined at the time of the employment decision at issue.  *See Hamm v. Exxon Mobil Corp.*, 223 Fed.Appx. 506, 508 (7th Cir. 2007) (citation omitted).

Plaintiff moves under the "actual disability" prong of the definition of disability, which requires her to show that she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A).  The term "substantially limited" refers to the inability to perform a major life activity "as compared to most people in the general population."  29

19

C.F.R. § 1630.2(j).  Major life activities include, but are not limited to, walking, standing, and working.  42 U.S.C. § 12102(2)(A).

Plaintiff claims she is disabled because:

[She] was diagnosed with having an improper hysterectomy, was unable to work at all for long periods because of the disability, was unable to travel to work for additional periods of time, was unable to travel long distances for additional periods of time because of the disability, had to go to the Mayo Clinic to be diagnosed, had to have a second operation for a large cyst and scarring . . . in order to correct the improper hysterectomy, received treatment for severe and long-lasting pain in the leg. . . .

Plaintiff's Response highlights the fatal defect in her disability case – the complete absence of evidence indicating that she was substantially limited in one or more major life activities at or near the time of her termination.  *Hamm*, 223 Fed.Appx.at 508.  Instead, Plaintiff admits that when Bohnert began the performance management process that led to her termination, "I was healthy.  I was doing great." (Plaintiff Dep. at 296).  In fact, at and near the time of her termination, Plaintiff was able to travel long distances, as evidenced by her trip to Switzerland for a DISN meeting in September 2010.  Accordingly, Plaintiff cannot establish she was a qualified individual with a disability under the ADA at the time of her termination.

Plaintiff's disability case falters for a second reason; she was not performing her position as Information Security Consultant to her employer's legitimate expectations.  The Background Section outlines in excruciating detail the performance issues which led to Plaintiff's termination.  That evidence provides more than sufficient support for her termination.

20

Plaintiff's primary response to the documentary evidence against her is her belief that Puckett somehow sabotaged her relationship with Bohnert such that Bohnert had an unfavorable view of her from the start.  For example, on numerous occasions throughout her Facts Section, she cites to an August 22, 2008, email communication between Kniesly and Bohnert in which Bohnert states, "We seem to have an issue with the performance of Julie delivering those security trainings effectively.  Greg [Puckett] mentioned that she is damaging the reputation of security if she contin[ues] doing that in [North America]."  Plaintiff claims Puckett's statement is an "outrageous lie."

Plaintiff's response fails to raise a genuine issue of material fact for several reasons.  First, there is no evidence that Puckett's statement was not true.  Indeed, in Plaintiff's 2008 Performance Appraisal, she admitted that her security awareness training "was not good."  (Plaintiff Dep., Ex. 29 at DEF1-122, 123).  Second, to the extent Plaintiff asserts a "cat's paw" theory — i.e., that Puckett's alleged bias influenced Bohnert's employment decisions to a large degree — Plaintiff fails to provide any evidence that Bohnert based his employment decisions on anything that Puckett said or did.  *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379-81 (7th Cir. 2011). The court therefore finds Plaintiff failed to establish she was meeting Roche's legitimate employment expectations at the time of her termination.

Having failed to establish a prima facie case of disability discrimination, the court need not reach the issue of pretext.  *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012).  Plaintiff's disability discrimination claim must be dismissed.

### 2.      Failure to Accommodate

Plaintiff claims that Roche failed to accommodate her alleged disability by: (1) not allowing her to participate in entire DISN conferences by telephone; (2) refusing to transfer her to another position; and (3) refusing to provide her severance.  As set forth above, Plaintiff failed to establish that she is a qualified individual with a disability and thus, Plaintiff cannot maintain an ADA failure to accommodate claim.  *See, e.g., Healy v. Nat'l Bd. Of Osteopathic Med. Examiners, Inc.*, 870 F.Supp.2d 607, 621 (S.D. Ind. 2012) (holding that plaintiff was not entitled to an accommodation given his inability to demonstrate he was disabled).

Even if she had established that threshold status, Plaintiff's ADA accommodation claim would still not survive.  Although Plaintiff testified she could not attend the March 2009 DISN Conference in Heidleberg, Germany due to health issues, Plaintiff's attendance at the DISN meetings were not an essential function of her position.  (Bohnert Dec. ¶ 12).  As such, Plaintiff's personal desire to attend entire DISN conferences by telephone cannot support an ADA accommodation claim as a matter of law.  *See, e.g., Mobley v. Allstate Ins. Co.*, 2006 WL 2735906, at *7 (S.D. Ind. Sept. 22, 2006) (finding that an employer is not required to provide whatever accommodation happens to be the desire of the employee).

Furthermore, Plaintiff's request for a transfer and for severance are not "accommodations" within the meaning of the ADA because they were not requests to accommodate or modify her job duties due to a physical limitation.  *See* 42 U.S.C. § 12112(b)(5)(A) (employer must make reasonable accommodations "to the known physical or mental limitations of an otherwise qualified individual with a disability");

22

*Pamon v. Bd. of Trs. of the Univ. of Ill.*, 483 Fed.Appx. 296, 298 (7th Cir. 2012) (holding that request for accommodation must stem from disability).  In fact, the evidence reflects that Roche denied Plaintiff's request for transfer and for severance because, under Roche policy, she was not eligible for either.  Accordingly, Plaintiff's reasonable accommodation claim fails as a matter of law.

### 3.   Retaliation

Lastly, Plaintiff claims Roche retaliated against her because of her disability for the same three reasons set forth with respect to her failure to accommodate claim. Plaintiff does not state whether she seeks to prove this claim under either the direct or indirect method of proof.  Roche argued the claim under the direct method of proof. With no other guidance from the Plaintiff, the court will analyze her claim in the manner advanced by Roche.

Under the direct method, Plaintiff must establish that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action taken by the employer; and (3) there is a causal connection between the two events. *Povey v. City of Jeffersonville, Inc.*, 697 F.3d 619, 624 (7th Cir. 2012).  Plaintiff's retaliation claim falters on the first and third elements.

Statutorily protected activity includes "oppos[ing] a practice made unlawful" by the ADA. *See, e.g., O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-3(a)).  Thus, in order for Plaintiff's complaint to constitute protected activity, her complaint must indicate that she reasonably believed she was challenging conduct prohibited by the ADA – i.e., disability discrimination. *Tomanovich v. City of*

*Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Gleason v. Mesirow Financial, Inc*., 118 F.3d 1134, 1147 (7th Cir. 1997).

Here, the protected activity of which Plaintiff complains is her oral complaint to Human Resources that Puckett said "she must have slept with her previous manager to get her job" in 2007. Plaintiff's complaint had nothing to do with her alleged disability, and indeed, it could not have, as the complaint was made more than a year before the onset of her alleged disability.

In addition, her complaint occurred three years before she filed the charge of discrimination preceding this matter. This three year time lapse is far too attenuated in time to support a causal connection. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1115 (7th Cir. 1992) (no causal connection between employee's discharge and his complaint three years earlier). *See also Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (six-month lag between complaint and denial of promotion was "too long to infer a link between the two"). Because Plaintiff fails to establish two of the three elements of her direct case, Plaintiff's ADA retaliation claim fails as a matter of law.

### C.     FMLA Retaliation

Under the FMLA, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). Plaintiff's FMLA retaliation claim requires her to address the same elements as her ADA retaliation claim. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011) (listing elements of FMLA retaliation claim).

The record shows that Plaintiff requested, and was granted, FMLA on four separate occasions: continuous leaves from May-June 2008, May 9, 2009-May 19, 2009, and September 2009-October 2009; and also intermittent leave running through November 15, 2009. (Declaration of Cindy Brandt ¶ 5). There is no evidence, however, that Roche criticized Plaintiff for taking these leaves or that it regarded her requests for leave negatively. To the contrary, Plaintiff concedes that Roche maintained an open door policy and freely encouraged her to take whatever time off she needed. (Plaintiff Dep. at 222 and Ex. 46; Bohnert Dec., Ex. 3).

In addition, the uncontroverted evidence demonstrates that Bohnert coached and mentored Plaintiff consistently both before and after she took FMLA leave. (Plaintiff Dep., Exs. 24, 29, 70; Bohnert Dep. at 23; Bohnert Dec., Ex. 4). As such, Plaintiff cannot demonstrate a causal relationship between her taking leave and any adverse employment action. *See, e.g., Long v. Teachers' Ret. Sys. Of Ill.*, 585 F.3d 344, 354 (7th Cir. 2009) (finding no circumstantial evidence of intent to retaliate where plaintiff's declining performance evaluations was documented before plaintiff took FMLA leave).

Lastly, Plaintiff was not terminated until February 7, 2011, well over a year after her last FMLA leave. This is far too attenuated in time to support a cognizable retaliation claim. *See, e.g., Cornelius v. Furniturefind Corp.*, 547 F.Supp.2d 918, 925 (N.D. Ind. 2008) (holding three-month time span between FMLA leave and termination insufficient).

For these reasons, Plaintiff's FMLA retaliation claim fails as a matter of law.

**IV.      Conclusion**

Plaintiff fails to raise a genuine issue of material fact with respect to her Title VII,

ADA and FMLA claims.  Accordingly, Roche's Motion for Summary Judgment (Docket

# 26) is therefore **GRANTED**.


**SO ORDERED** this 12th day of September 2013.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.